PARIS EXCHANGE BANK v. H. HULEN.

Decided May 27, 1899.

**Homestead in City—Forty Acres Exempt.**

One who owns and occupies as a homestead a tract of land mostly within the limits of a city, containing forty acres, which has never been laid off into blocks or lots, and most of which is used for farming purposes, may claim the entire tract as an exempt homestead, although people live and own property divided into lots on three sides of the tract, and although the owner does business and maintains an office in the city as a land agent, sends his children to the public schools, votes in city elections, consents to the maintenance of streets, and although the street in front of the tract is occupied by street car tracks and gas and water mains.

APPEAL from Cooke. Tried below before Hon. D. E. BARRETT.

*E. P. Scott* and *Davis & Garnett*, for appellant.

*Potter & Potter*, for appellee.

CONNER, CHIEF JUSTICE.—This was an injunction suit brought in the District Court of Cooke County, Texas, by appellee Hulen against appellants, the Paris Exchange Bank and G. W. Womack, to restrain said Womack, as sheriff of Cooke County, Texas, from proceeding to sell under an execution in favor of said bank the land described in plaintiff's petition, which land the plaintiff claimed as his rural homestead.

The case was tried November 14, 1898, before the court without a jury, and resulted in a judgment perpetuating the injunction, from which judgment defendants have prosecuted this appeal.

The following are the facts:

It was admitted that in the District Court of Lamar County, Texas, on the 5th day of April, 1889, the Paris Exchange Bank recovered against H. Hulen, G. G. Vincent, and E. C. Peery, a judgment now amounting to $6334.94, inclusive of interest, upon which an alias execution was issued to Cooke County, Texas, on the 12th day of August, 1898, and was levied September 1, 1898, by the defendant Womack, as

sheriff of Cooke County, upon the land in controversy, and at the time of granting the injunction herein said Womack was proceeding to sell said land pursuant to said levy.

The plaintiff, H. Hulen, in his own behalf testified: "I am and have been a married man and the head of a family for more than twenty years. I have owned and resided upon the land in controversy ever since I purchased the same from J. T. Rowland on the 9th day of September, 1889, with my family as my home."

[The plat on the following page illustrates the premises in controversy, and the streets and contiguous lots, lands, etc., mentioned in the testimony:]

"When I bought the land the improvements were the same as they are now, with the exception that the two-story frame residence in which J. T. Rowland resided was destroyed by fire since I bought it, and I rebuilt with brick. J. T. Rowland was living in the residence when I first knew it, about the year 1874, and resided there continuously until he sold to me, and I have resided at the same place ever since. The land was inclosed and used as a farm when I bought it, and has been so used ever since. It is suitable for farming purposes.

"A part of the Peter Clark survey is embraced in the corporate lines of the city of Gainesville. About thirty of the forty acres in controversy are inside the corporate lines. The corporation lines form a square. The land in controversy is 320 varas north and south at the west end of the same, and the north line is 772 varas long. Lindsay Street runs east of my residence, and my residence fronts on the same. There is a road, opened by the county, running north and south along my west line. No part of the forty acres in controversy has ever been laid off into blocks or lots or put into a plat of the town that I am aware of. There are no streets on my north or south line, and no streets crossing my land.

"The Mary E. Clark 640 acres survey is square, and the Peter Clark survey is the same size and shape, and adjoins it on the south. I don't know when Gainesville was first incorporated. It was incorporated when I came to the country in 1874. I am a land agent. The town originally comprised forty acres out of the northwest corner of the Mary E. Clark survey. The center of the public square, or courthouse, is 710 feet south of the north line of the Mary E. Clark survey, and the same distance from the west line of the survey. Gainesville was first incorporated with the corporate lines one mile square, with the courthouse for the center, but some time in the 70's the corporate lines were extended so as to embrace four square miles, with the courthouse in the center; that is, the corporation is a square, each line being two miles long, and the courthouse is in the center. The present south line of the corporation is 710 feet south of the north line of the Peter Clark survey.

"California Street, one of the principal business streets of Gainesville, runs east and west, and crosses the north part of the public square. Lindsay Street runs from it at a point about 400 yards east of the public

square, and continues south to the corporate line, and after leaving the corporation continues on south as a road. About 1883 the city granted a franchise to the water company, and one of the water mains was laid along Lindsay Street to J. T. Rowland's residence, and a fire plug was placed in front of his residence, and has been maintained ever since. About the same time the city granted a franchise to a gas company, and its gas mains were laid along Lindsay Street to J. T. Rowland's residence, and gas fixtures were put in his house, and were there in use when I bought the place, but I have since had them taken out. My house was numbered like the other residences in Gainesville, but I do not remember the number.

"I was alderman for four years just after buying from Rowland, and Rowland while he resided on the place was mayor of Gainesville for several terms. The population of Gainesville in 1880 was about 2600; in 1890 it was between 6000 and 7000; and the population is now from 8000 to 10,000.

"Lindsay Street was laid off in 1878, as near as I can recollect. The upper part of it was known as Lindsay Street when I came here in 1874. It was laid off before I came here, but about 1878, when Mr. Lindsay laid off his addition, it was extended on south. Lindsay Street extends north of my house nearly a mile to California Street, and south to the corporate line. Some time about the year 1880 Gainesville granted a charter to a street railway company, and its track was laid on Lindsay Street to a point opposite Rowland's residence, and has ever since been maintained, and during the present year the line has been extended on south beyond the corporate limits to the park.

"I have about 225 feet front on Lindsay Street. The street occupies the east part of the land described in the deed from Rowland to me. The street was taken out of Rowland's land; that is, the boundaries extend out into the street. David Rowland joins me on the north. His lot fronts 75 or 80 feet on Lindsay Street, and runs back west about 300 feet. He has lived there from fifteen to twenty years. The next place is Atkinson's, and he adjoins Rowland on the north and has about the same front and depth as Rowland. The next place is W. W. Howeth. He joins Atkinson on the north. Howeth's lot is about 130 feet front, and runs back west 400 or 500 feet. The defendant Womack's place lies north of and adjoining Howeth's, and is the same size. Adjoining Womack on the north is the Bailey residence, which has about 300 feet front on Lindsay Street, and runs back west far enough to include about fifteen acres. Adjoining the Bailey place on the north is the Wells residence, which occupies a small lot, about 65 feet front. North of and adjoining that is the Ross residence, occupying about 150 feet, and north of that is Mrs. Apperson's place, occupying about 100 feet front. These places all join and have been occupied as residences for the last fifteen or twenty years. The residences continue on north to California Street, having the fronts customary in cities of the size of Gainesville.

"The east side of Lindsay Street is divided up into lots from Lindsay

Street to the south line of the corporation, and has been built on nearly the entire distance. Bailey built before I bought out Rowland. Bailey bought several small places and threw them together so as to make one lot. Morter adjoins me on the south. He has about 80 feet front on Lindsay Street, and runs back west about 200 feet to my land. Waterman's place adjoins Morter on the south. It has about 300 feet front on Lindsay Street, and runs back west to my land. The next place is a small place belonging to a Dutchman. The next place belongs to Stevens. There are six residences south of me on the west side of Lindsay Street. They all have small places except Waterman. Stevens has a little over 100 feet. I sold the Stevens place. I sold that part of the land which I bought of Rowland lying south of the land levied on, to Stevens. The east side of Lindsay Street is thickly settled all the way from California Street to the corporate line, and there are some few houses south of the corporate line. It is more thickly settled than the west side. The people have small fronts or town lots along the east side of the stret.

"I would have to run 350 or 400 feet west of Lindsay Street to take in my barn and lot. The bulk of my land is on the Peter Clark survey. The dividing line between the two Clark surveys runs right by my house on the north side. The north part of my yard is on the Mary E. Clark. I have about twenty varas of the Mary E. Clark survey in my yard. I have been using the land back of my barn as a farm, cultivating it in wheat and corn and so forth. I am in the real estate business, and have an office in the business part of the town, and have been a real estate agent and maintained an office in the business part of the town ever since I bought from Rowland, and nearly ever since I have been living in Gainesville.

"J. T. Rowland sold off the land south of his residence, which is now occupied by Morter, Waterman, and others, about 1884 or 1885, after it was embraced in the corporate limits of the city. The first ward public school is on Lindsay Street, a little over a quarter of a mile from my house. My children have attended public school ever since I have lived in Gainesville, and I have voted at all the elections. McCubbin Street leaves Lindsay Street nearly in front of my house and runs east, crossing the railroad about 300 feet east of my house, and continues on east 200 or 300 feet further, but stops before reaching Pecan Creek. Another street leaves McCubbin Street soon after it crosses the railroad, and runs south through the Rice addition. The Rice addition is laid off in lots and blocks. It was laid off some two or three years ago.

"I have been rendering the land which I own out of the Mary E. Clark survey as the south sixty and the west half of block 77, ever since I have owned it. The street or road on my west line runs from the northwest corner of the Mary E. Clark survey to the southwest corner of the Peter Clark survey, and a part of it is within the corporate limit. There is no street south of me. There is a pass-way which Morter and I use.

It is uninclosed. He owns one half of it and I own the other half. To commence on Lindsay Street and run back 400 feet would give me my residence, barns, outhouses and lots. It would take in all except the land I have been using as farm land, and would also leave me two acres out of the Mary E. Clark survey.

"Elm Creek runs through the western part of the corporate limits of Gainesville, and Elm bottom is a half a mile wide in places. West of my house it is over half a mile. My house is a half mile east of Elm Creek. Elm bottom overflows sometimes, and it is not well adapted for residence purposes, and has not been used to any considerable extent for residences, but most all the high land east of Elm bottom has been used for residence purposes. My residence is on the upland or highland, but it is not far west of my barn until the bottom is reached. The water has been within 100 yards of my barn.

"Commerce Street, which runs south from the southwest corner of the public square, is used for residence purposes until it reaches Elm bottom. Dixon Street, which runs south from the southeast corner of the public square, is thickly settled, and is used for residence purposes until it reaches Elm bottom, and has a few residences on it after it reaches the bottom. It extends to within a quarter of a mile of my land. Denton Street, which is one of the principal residence streets of Gainesville, runs north and south 300 feet west of Lindsay Street, and is thickly settled all the way, but it does not extend as far south as Lindsay Street. It formerly stopped about a quarter of a mile before reaching my land, but has recently been extended 300 or 400 feet further south. South Dodson Street is 150 feet west of Denton Street, extending as far south as Denton Street, and the land on it is divided into lots and blocks, and all of it used as residence property that is suitable for that purpose. The most of the houses south of me on the west side of Lindsay Street have been there ever since I bought from Rowland. Some of the houses south of me on the west side were there when I bought from Rowland, but some of them have been built since. In all that section of the city, that is, along Denton Street, Lindsay Street, and Dodson Street, the high land such as I live on has been used for residence purposes for the last ten or twelve years, but the bottom lands west of these streets, unfit for residence purposes, have been used for farm lands.

"Mrs. McCubbin owned the land out of the Peter Clark survey on Lindsay Street just across the street from my land. Mrs. McCubbin sold three or four lots fronting west on Lindsay Street, and they have been improved for some time. Mrs. McCubbin did not lay off any addition to the town. All of Mrs. McCubbin's land was in the corporate limits. Mr. Rice bought the McCubbin land, and also bought some land from the First National Bank, lying partly within and partly south of the corporate limits, and laid it and the McCubbin land off into what is known as the Rice addition. This was three or four years ago. All the houses south of me on my side of the street are not within the corporate limits. Stevens is south of the corporate limits. There are only three houses

south of me within the corporate limits until Bush a short while ago moved his house just over the line in order to send his children to school. Denton, South Dodson, and Dixon Streets would pass over my land if they were extended far enough, but they stop within about a quarter of a mile of my land, with the exception of Denton Street, which has recently been opened across the Addington property, and extends about 300 feet farther south than Dixon and Dodson. Elm bottom has not been much used for residence purposes, because it is subject to overflow and is bottom land. All along the north line of the Peter Clark survey to Lindsay Street, where the land is high and suitable for residence purposes, it is thickly settled. My side of Lindsay Street is thickly settled until you reach the corporate line. The east side of Lindsay Street is thickly settled until you get to the south line of the corporation, and there are only two or three houses below that. Where Lindsay Street now passes the front of my house was once a public road, and when the city limits were extended the public road was made Lindsay Street."

There are but two assignments of error, and they will as a matter of convenience be treated together. They are as follows:

"1. The court erred in perpetuating the injunction and in adjudging the land in controversy to be the homestead of the plaintiff, because the proof showed that if the plaintiff was entitled to any homestead, it was an urban homestead, while he claimed in his petition a rural homestead.

"2. The court erred in perpetuating the injunction as to all of the land in controversy except a strip of 225 feet on Lindsay Street, beginning at Morter's northeast corner, and running to Rowland's southeast corner, and running back west 400 feet, so as to include plaintiff's residence, barn, lots, etc., because the proof shows clearly that said residence is within the city of Gainesville, and that plaintiff is entitled to an urban and not to a rural homestead, and that the land west of this is not and has never been used for the purpose of a home, but as farm land, and does not constitute any part of his homestead."

The case thus presented is not without difficulty, and while as an original question we might be inclined to hold otherwise, yet after careful consideration we have been unable to distinguish it from those presented in the adjudicated cases as to enable us to say that the conclusion reached by the court below was erroneous.

Without here attempting to discuss the authorities at length, it will be seen by examination that in the case of Taylor v. Boulware, 17 Texas, 74, Boulware had acquired a rural homestead, and that thereafter the limits of the city of Marshall had been extended so as to include a part of his homestead, including the dwelling house; but the court held that the whole remained in the rural homestead notwithstanding such extension, it not appearing that Boulware's land had in fact been laid off into streets, lots, or blocks.

In the case of Posey v. Bass, 77 Texas, 512, Posey had acquired a rural homestead, but afterwards, in 1884, the town of Sweetwater was incor-

porated and extended so as to include Posey's dwelling and the greater part of his land, the contiguous lands being laid out into streets, blocks, and lots. It appears also that at the time of the creditor's levy Posey, with a partner, was doing business as a land agent in the town of Sweetwater, and that said firm owned the house and lot in which they were doing business. Posey cultivated or rented part of his homestead tract, as occasion offered, and used the remainder as a pasture. It was held that, notwithstanding these facts, Posey's land never in fact became a part of the incorporated town so as to lose its rural character.

In the case of Wilder v. McConnell, 45 Southwestern Reporter, 145, McConnell and wife had acquired a rural homestead and had erected several rent houses thereon, separating them from each other and from the McConnell residence by fences, etc. The limits of the city of Weatherford were extended so as to include the McConnell homestead block of four acres, and by consent of McConnell and wife streets were opened, graded, and graveled along two sides of their block, they setting back their fences twenty feet for that purpose. It was shown also that at the time of the levy in that case people lived all around this block, and that the McConnells used their tenant houses for purposes of rent alone. The court held that it was a rural homestead. Speaking by Judge Brown, the court says: "In arriving at a conclusion as to whether the land is located within a city, town, or village, the fact of incorporation or not is not of controlling influence, and will not of itself determine that the land is or is not within the limits of a city or town." And again: "The property in question may be within the corporate limits of a town or city, and be a rural homestead, within the meaning of the Constitution."

In the case of Watkins v. Abbott, 14 Texas Civil Appeals, 447, Abbott's land was partly within and partly without the corporate limits of the city of Greenville, and so was when he bought it in 1887. He claimed his residence as in said city, voted in city elections, sent his children to the public schools therein, etc., and yet it was held that the whole was his rural homestead. A writ of error was denied in this case.

Other cases perhaps might be profitably cited, but it will be thus seen that almost every fact here relied upon to defeat appellee's claim has been met and adjudicated. The fact that people live to the north, south, and east of him does not seem to do so. The fact that he does business and maintains an office in the city as a land agent, sends his children to the public schools, votes in city elections, consents to the maintenance of streets, it is held, will not do so. We can not say that the further fact that the city has permitted the construction and maintenance of gas mains, street car line, etc., along and in front of his premises will turn the scale against him. The city may have encroached upon him, he may have urban neighbors and conveniences, he may have indeed segregated by sale a part of his homestead tract, as was done in the case of Wynne v. Hudson, 66 Texas, 1. Yet the particular parcel of land here in controversy constitutes the place of the actual residence of himself and family, and is used as a home. Neither by his own act nor by the act of

the city in question has it been actually divided into streets, lots, and blocks, or otherwise dedicated to urban uses, and we feel unable to say that the court below should have proceeded to define appellee's homestead by designating a line, never before fixed, of 275 feet fronting on Lindsay Street, and thence extending back 400 feet, as insisted in behalf of appellee.

Without further discussion the judgment will be affirmed.

*Affirmed.*

Writ of error refused.